*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
TANG, HITESMAN, and STEPHENS,
Appellate Military Judges

―――――――――――――

**UNITED STATES**
Appellee

**v.**

**Jeffrey D. PITTMAN**
Senior Chief Petty Officer (E-8), U.S. Navy
Appellant

**No. 201800211**

Decided: 24 January 2020.

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Commander Shane E. Johnson, JAGC, USN. Sentence adjudged 16 March 2018 by a general court-martial convened at Joint Base Pearl Harbor-Hickam, Hawaii, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to pay-grade E-1, forfeiture of all pay and allowances, confinement for 30 years, and a dishonorable discharge.

For Appellant: Mr. Frank Spinner, Esq., Captain Nicholas Mote, USMC.

For Appellee: Lieutenant Commander Timothy Ceder, JAGC, USN; Captain Brian Farrell, USMC.

―――――――――――――

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

―――――――――――――

TANG, Senior Judge:

A panel of members with enlisted representation convicted Appellant, contrary to his pleas, of: three specifications of Article 120, UCMJ,[1] for committing sexual acts and sexual contacts by bodily harm against his then-sixteen-year-old daughter, Sarah;[2] three specifications of Article 120b, UCMJ,[3] for raping and committing lewd acts upon Sarah before she turned 16; and three specifications of Article 128, UCMJ,[4] for physically abusing his three other children, Oliver, Mike, and Amy. Appellant was acquitted of four specifications of Article 120, 120b, and 128.

Appellant asserts four assignments of error (AOEs): (1) the evidence is legally and factually insufficient to support findings of guilt for the six specifications charging Appellant sexually abused Sarah; (2) the military judge abused his discretion by denying the Defense motion to produce Sarah's mental health records; (3) the evidence is factually insufficient to support findings of guilt for the three specifications of Article 128; and (4) the trial defense counsel were ineffective because they did not call witnesses who might tend to show that Sarah falsely accused Appellant of sexual abuse.[5] We find no prejudicial error and affirm.

# I. BACKGROUND

Appellant and his wife had four children. At time of trial, their daughters Sarah and Amy were 17 and 13 years old, respectively. Their sons Mike and Oliver were 15 and 16 years old, respectively.

In April 2017, when Sarah was 16, she was crying while on the phone with Brian,[6] her boyfriend, and disclosed to him that that Appellant, her father, had been sexually abusing her for years. Brian called 911 the next day and reported the crime. Sarah was interviewed and told investigators about the sexual abuse. Through the investigation, authorities learned that all four

---

[1] 10 U.S.C. § 920 (2012).

[2] All children's names used in this opinion have been changed.

[3] 10 U.S.C. § 920b (2012).

[4] 10 U.S.C. § 928 (2012).

[5] AOEs 3 and 4 were raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

[6] This witness name has also been changed.

of Appellant's children alleged he physically abused them. Further facts necessary to resolve the AOEs are included below.

## II. DISCUSSION

### A. Legal and Factual Sufficiency of Child Sexual Abuse Convictions

Charge I, Specifications 1-3, and Charge II, Specifications 1-3, alleged that Appellant sexually abused Sarah before and after she turned 16. Appellant argues the evidence supporting the convictions to these specifications was both factually and legally insufficient because Sarah's testimony was incredible and contradicted by physical evidence.

#### 1. Standard of review for legal and factual sufficiency

When testing for legal sufficiency, we must determine "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[7]

We review questions of factual sufficiency de novo.[8] The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this Court is] convinced of appellant's guilt beyond a reasonable doubt."[9] In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[10] Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict.[11]

We find these convictions were both legally and factually sufficient. Sarah's testimony was the only direct evidence of sexual abuse. Her trial

---

[7] *United States v. Meakin*, 78 M.J. 396, 400-01 (C.A.A.F. 2019).

[8] Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[9] *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation, internal quotation marks, and emphasis omitted).

[10] *Washington*, 57 M.J. at 399.

[11] *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

testimony alleged all of the elements required to prove the offenses.[12] Reviewing the entirety of the evidence admitted at trial, we find that a reasonable factfinder could have found Appellant guilty beyond a reasonable doubt. We are likewise independently convinced of Appellant's guilt.

### 2. Sarah's testimony about sexual abuse

Sarah testified that Appellant physically abused her and her siblings. He slapped her and her sister and, on several occasions, cornered her two younger brothers and repeatedly punched them in the chest and abdomen. He also repeatedly beat them with the metal buckle end of a belt. Against this backdrop, Sarah testified that shortly after her twelfth birthday, her father told her he wanted to share a closer relationship with her. Then he began to sexually abuse her. On the very first instance, he interrupted her while she was working on homework, summoned her to the master bedroom, and locked the door. He told her to take off her clothes and to lie down on his bed. He said that he needed to check that "everything was all right" with her body.[13] Then he penetrated her anus with his penis.

---

[12] Charge I, Specifications 1-3, were alleged on divers occasions between 5 April 2016 and 24 April 2017, and related to a time period after Sarah turned 16.

The elements of Charge I, Specification 1, were that Appellant penetrated Sarah's anus and vulva with his penis on divers occasions by causing bodily harm to her because he did so without Sarah's consent. The elements of Charge I, Specification 2, were that Appellant penetrated Sarah's vulva with his mouth and finger (with an intent to gratify his sexual desires) on divers occasions, and that he did so without her consent. Charge I, Specification 3, required proof that, on divers occasions, Appellant touched Sarah's breasts, buttocks, and inner thigh directly and through the clothing with an intent to gratify his sexual desires, and without Sarah's consent.

Charge II, Specifications 1-3, covered a time period before Sarah turned 16, and alleged abuse on divers occasions between 28 June 2012 and 4 April 2016. Sarah's testimony established that she was under the age of 16 during the time period alleged. For Charge II, Specification 1, the Government had to prove that Appellant penetrated Sarah's vulva and anus by force based on parental authority. Charge II, Specification 2, alleged Appellant forcibly (by use of parental authority) penetrated Sarah's vulva with his mouth and finger with the intent to gratify his sexual desires. Charge II, Specification 3, required proof that Appellant touched Sarah's breasts, buttocks, and inner thighs, with an intent to gratify his sexual desire, both directly and through the clothing.

[13] Record at 963.

Sarah testified that she did not want him to do this, but she believed she had no choice because she was afraid he would hurt her or her siblings or mother if she resisted. She felt disgusted and scared. When she cried out in pain, Appellant covered her face with a pillow. At some point, he stopped and ordered her to go to the bathroom within the master bedroom. She did not see what he did next.

Sarah testified that Appellant continued and expanded the abuse. He performed oral sex on her, penetrated her vulva with his penis, and touched her thighs, breasts, and buttocks.

She testified that he established a routine. Mrs. Pittman was a stay-at-home mom for many years, only returning to work part-time a few months before Sarah disclosed the abuse to her boyfriend in April 2017. When Mrs. Pittman would leave on an errand, Appellant would abuse Sarah. Sarah's siblings were usually outside playing with other children, or they were in their rooms. Appellant would call out Mrs. Pittman's name to confirm she was gone. Then he would either go to Sarah's room or he would summon her to the master bedroom. He would always lock the door. Sometimes he let her choose whether they would use her room or his. He would turn the stereo volume up to what Sarah described as level "twenty," loud enough that others in the house could hear the music.[14] He would lay a towel on the bed and direct her to lie down on it. He would remove her glasses and set them aside. He had a wet washcloth handy, but Sarah did not see what he did with it. If she cried, he would cover her face with a pillow. He told her he could get in trouble if she told anyone what he did. So, for five years, she never told anyone.

Sarah testified that Appellant sometimes used a specific brand of liquid sexual lubricant when he penetrated her. A bottle of that brand of lubricant was recovered from Appellant's nightstand, though Mrs. Pittman testified the couple used the lubricant and maintained it in a visible place on top of their nightstand.

Sarah never resisted, but sometimes she told Appellant she was menstruating in order to dissuade him. Sometimes this tactic worked, but not always. The abuse began monthly, then escalated to weekly. On cross-examination, Sarah admitted she had also told prosecutors it happened daily—which she explained to mean almost every day, except when Appellant was at sea.

---

[14] *Id.* at 965.

Sarah testified that Appellant committed all of the charged acts both before and after she turned 16.[15] She never consented to the acts or did anything to lead her father to believe she wanted to have sex with him. Sarah testified that she could not recall the details of any specific incident. When asked why not, she said, "I was in pain and I don't . . . want to remember that pain because it physically hurts me."[16]

### 3. Circumstances surrounding Sarah's disclosure

Shortly before Sarah first disclosed the abuse in April 2017, several events took place. Appellant gave Sarah a diamond necklace for her birthday, something she considered to be a lavish gift. Appellant also planned to take her on a solo father-daughter trip to Colorado for "bonding time."[17] Also, on a Saturday night, one day before Sarah's first disclosure to Brian, Appellant came into Sarah's room while her younger sister Amy was sleeping in bed with her. He used his fingers to penetrate Sarah's vagina. Sarah became concerned for Amy.

While talking to Brian on the phone on Sunday night, she asked him whether he "ever had a family member who has had a crush on [him]," then she "said that she does, but it's her father."[18]

After telling Brian, Sarah told one of her brothers. That afternoon, unaware of Sarah's disclosures, Appellant came into Sarah's room and rubbed lotion on her back, between her thighs, and on her breast. Then he pushed her onto the bed and "started grabbing and sucking on" her breast.[19] Sarah made an excuse that she had to leave to pick up her other brother. When she picked up this brother, she was crying, so she disclosed the abuse to him, too. Both Brian and Sarah's brother urged her to report the abuse. Brian called the police the next day.

### 4. Corroborating testimony by Sarah's siblings and Mrs. Pittman

There were no direct witnesses to Sarah's sexual abuse. However, Sarah's three siblings described Appellant's habit of spending time alone with Sarah

---

[15] *Id.* at 977.

[16] *Id.* at 1419.

[17] *Id.* at 996.

[18] *Id.* at 1487 (as relayed during Brian's testimony).

[19] *Id.* at 989.

behind locked doors with the music turned up loud when Mrs. Pittman was away.

Sarah's brother Mike was 16 years old at time of trial. He testified that he was not completely shocked when Sarah told him about the abuse. He explained:

> Well, my dad . . . would . . . take my sister in his room and lock the door when my mom would go away, kind of just blast music. And he really didn't do that too often with us other kids. Like, he would every once in a while, but it was more with her.[20]

Mike testified he noticed this pattern about a year after the family moved to Hawaii in 2012. The music was so loud that it could be heard throughout the house. Mike estimated Appellant did this a few times per week. He explained that Appellant told Mike and his brother Oliver to knock on the bedroom door when Mrs. Pittman returned home. When Mike did so, Appellant would open the door to talk to him, then close the door and shortly thereafter come out of the room.

Oliver, who was 15 years old at time of trial, also corroborated Appellant's habit of taking his children into his room one-on-one. He described:

> One thing that my dad would always do when my mom would be going out is he would always go up to his room and lock the door. And during that time, he would invite us in, you know, in groups, you know, singles sometimes; just me sometimes, you know, my brother and my sisters.[21]

Oliver did not notice that Appellant took any one child into the room more than any other. He theorized that when Sarah was alone with Appellant they were just "chillaxing, listening to music, playing games on his computer," like Oliver did with Appellant.[22] But he did not know what actually happened when they were alone together. Oliver testified that when Appellant took Sarah into the room alone, he played music very loudly—more loudly than when he took the other children into the room with him. He also described how Appellant directed him to knock on the door when Mrs. Pittman re-

---

[20] *Id.* at 1067.

[21] *Id.* at 1140.

[22] *Id.*

7

turned home. When Oliver would alert him, Appellant would stop and "just go downstairs" and "act like he was doing something else."[23]

Both Oliver and Mike saw Sarah soon after her disclosure to Brian. They both described her as being upset. They could tell something was wrong, and she told each of them—in separate conversations—what had happened. Like his brother Mike, Oliver testified he was not surprised by Sarah's disclosure because he also had suspicions.

Sarah's younger sister Amy was 13 at time of trial. Amy testified that Appellant often had "cuddle time" in his bedroom with Amy and Sarah—sometimes together but more often with Sarah alone.[24] She testified that Appellant created a schedule to plan which daughter would cuddle him at various times. Cuddle time only happened when Mrs. Pittman was away. The door would be closed and locked when Sarah was having one-on-one cuddle time with their father.

Amy testified that Appellant ordered the children to "[j]ust knock on the door or tell him loudly" when Mrs. Pittman returned home.[25] When she alerted him that Mrs. Pittman was home, either Appellant would walk out immediately or say, "I'm coming in a minute."[26] Sometimes, Amy would knock on the door simply because she wanted to join—not because Mrs. Pittman had returned. She described, "I didn't hear anything . . . or he would say that we need, like, more time. Or they're just quiet."[27] Sometimes Appellant made Amy talk to him through the closed door.

Mrs. Pittman testified she ran almost all of the errands for the family. She was also out of the house frequently because she was involved in her church and her children's activities. Mrs. Pittman did not know that Appellant spent time alone with each of the children behind closed doors. Nor was she aware that he directed the children to notify him when she returned home. Her daughters never told her about cuddle time. Until Sarah made her report, Mrs. Pittman had no idea that Appellant was sexually abusing her.

---

[23] *Id.* at 1142.

[24] *Id.* at 1187-88.

[25] *Id.* at 1189.

[26] *Id.* at 1190.

[27] *Id.*

*5. Physical evidence and expert testimony presented at trial*

Physical evidence neither confirmed nor ruled out abuse. Sarah had a sexual assault forensic examination (SAFE) three days after Brian called the police. A medical doctor performed the exam. The examining doctor did only a cursory inspection of Sarah's anus because her allegation—as relayed to him—did not include accusations of anal penetration. He did not perform a full anal exam, but his inspection did not note any abnormalities.[28]

The doctor noted minor tissue discoloration and swelling or tenderness of Sarah's hymen.[29] Those injuries could have been caused a few days before the exam. But, because Sarah had engaged in some sexual activity with Brian shortly before the SAFE, the findings were of little evidentiary value. The doctor did not notice any signs of chronic genital trauma. The doctor testified that chronic abuse could result in scarring of the external genitalia. However, an absence of findings does not disprove abuse occurred. Use of a lubricant makes injury less likely—as does a lack of force.

The Defense presented the expert testimony of a master clinician SAFE examiner who directs the SAFE program at a major Naval hospital. She had not examined Sarah but opined that swelling of Sarah's hymen would only be seen within 24 hours of injury, and therefore that injury was not the result of Appellant digitally penetrating Sarah the day before her disclosure (four days before the SAFE). The Defense expert testified that if a female child is vaginally penetrated before she begins menstruating, it is more likely that such penetration will leave areas of scarring on the hymen. Sarah began menstruating at the age of 13; abuse began at age 12. The Defense expert testified that she was surprised, given Sarah's allegations, that the SAFE examiner did not find any physical evidence of chronic abuse. She opined that the findings were not consistent with Sarah's allegation of penetrative sexual abuse spanning 5 years. However, she agreed that the "lack of physical findings [did] not mean that the abuse did not occur."[30]

Swabs from the SAFE were analyzed for DNA. Lab analysis revealed that male DNA of an undetermined source was found on Sarah's breast, but no further DNA evidence was found. A set of Sarah's sheets were tested, but

---

[28] *Id.* at 2054.

[29] *Id.* at 1694.

[30] *Id.* at 2049.

Appellant's DNA was not found. Male DNA in Sarah's underwear belonged to her boyfriend, not Appellant.

Appellant consented to a search of his home, DNA, and electronics. A search of Appellant's electronic devices yielded no evidence pertinent to the investigation. It did not contain any evidence that Appellant ever searched for or viewed child pornography.

Both the Government and Defense presented testimony from expert clinical and forensic psychologists. The Government's expert testified that Sarah's disclosure timing and pattern was consistent with the known pattern of disclosure of victims in "verified" cases of child sexual abuse.[31] She testified it is not uncommon for another parent to be unaware of sexual abuse. She also noted children tend to be "compliant" to parental abuse.[32]

The Defense's psychology expert testified that if abuse occurred almost daily, as Sarah claimed, the expert would expect "more than three or four occurrences to be memorable."[33] Though it would be reasonable that Sarah would not remember exact dates, the expert expected that her memories would be "tethered" to "special dates," such as birthdays, church events, holidays, etc.[34]

*6. Appellant's statements to NCIS.*

Some of the most incriminating evidence came from Appellant's own words. Appellant waived his privilege against self-incrimination and spoke with NCIS agents for hours. Although he adamantly denied that he ever sexually abused Sarah, he corroborated several aspects of her allegations. He admitted he touched her body in innocent ways that he suggested she might have misunderstood. At times, he painted Sarah as sexually deviant and deeply disturbed in an apparent effort to discredit her.

When Appellant arrived at the NCIS office, he saw his family's car there. He kept asking the agents what he was being accused of, even offering some theories and explaining them away before agents could begin questioning him. When he was told Sarah alleged he sexually abused her, he immediately stated, "I'm very touchy-feely with all my kids" then explained several benign

---

[31] *Id.* at 1542.

[32] *Id.* at 1541.

[33] *Id.* at 1950.

[34] *Id.*

acts such as shoulder massages.[35] He also immediately and repeatedly claimed that Sarah had been acting strangely that weekend. He blamed her mood on an "incident a couple years ago with a boy, telling her that he wants to rape her" or because she had gone to church alone for the first time on Saturday night.[36]

When agents first began interviewing Appellant, other agents were interviewing Sarah. The agents interviewing Appellant, therefore, did not know all of the details of Sarah's allegation. Without being asked about them, Appellant volunteered several details that lend credibility to Sarah's claims.

Before being told that Sarah alleged he rubbed lotion on her breasts that weekend, Appellant described how he walked in on Sarah nude after she said that her back hurt. Then he put lotion on her back, at her request, because her skin was dry. She was not wearing a bra or shirt, but she crossed her arms over her breasts. Then he said he hugged her, and she put her clothes on. He kept saying his son was in the other room, perhaps insinuating that the son could walk by at any time. Much later in the interview, he said, "All I remember is massaging her back and I got the frickin' front," but this time he said Sarah was wearing a bra at the time.[37]

At another point in the interview, Appellant stated that something must have happened to Sarah the night before, then reiterated that he rubbed lotion on her back earlier that day. When agents accused him of rubbing lotion on her genital area, Appellant expanded his statement to say he "rubbed lotion on her back and on her legs."[38]

---

[35] Prosecution Exhibit (PE) 1 at 11. PE 1 consisted of portions of Appellant's videotaped NCIS interview and a transcript of those interview excerpts. The members were instructed the transcript was merely an aid to assist them in listening to the video recording. This Court has reviewed the video and verified the accuracy of the transcript. For citation purposes, all citations will be to the transcript of PE 1.

[36] *Id.* at 12.

[37] *Id.* at 97. In PE 1, the Appellant did not gesture to indicate what he meant when he referred to the "frickin' front." After making this statement, he gestured toward his legs and stated that Sarah was wearing shorts at the time. Based on the context of the conversation, we believe it is fair to infer that Appellant was referring to Sarah's chest area.

[38] *Id.* at 85.

Appellant admitted that he did go into Sarah's bedroom and touch her while his younger daughter Amy was in bed with her. He said:

> I told my daughter to face the other way and I put her pillow between her legs, because that's what she likes. I put the other pillow between my other daughter's legs. . . . I told them I loved both of them. I asked her if she was okay. She said, yes, but not her normal self."[39]

It was known in the family—at least among Sarah, Appellant, and Mrs. Pittman—that Sarah suffered from chronic constipation since infancy and needed assistance to use enemas. At trial, Sarah testified her mother usually assisted her, but that Appellant did so on one occasion. Mrs. Pittman testified she knew this happened. However, during his NCIS interview, Appellant described a violent administration of enemas. He described that Sarah would lie down naked. He said he would apply sexual lubricant—the same brand Sarah described and which was recovered from his nightstand—to the tip of the enema. He said, "and then I *hold her down* and then I let her go, I let her go poop. And I say hey, it's going to hurt a little bit but eventually all that stuff's going to come out."[40]

Most importantly, Appellant agreed that he would frequently spend time in his bedroom with the door locked and the stereo turned up loud when Mrs. Pittman was away. He also admitted he would direct his sons to knock on his door when Mrs. Pittman would return home. However, he claimed he was in his room alone, incessantly masturbating to pornography and that he had to do this in secret because Mrs. Pittman viewed pornography as cheating.[41]

After agents finished interviewing Sarah, they had more details and more questions. When agents asked Appellant why Sarah would know what type of towel he used to ejaculate into, Appellant said, "Shit, she knows about the white towels. The white towels are what I use when I [masturbate]".[42] He said, "I wet it cause I use [sexual lubricant]."[43] He then said, "She knows about the cloth which blows my f[***]ing mind, because I thought I was very

---

[39] *Id.* at 116.

[40] *Id.* at 51.

[41] At trial, Mrs. Pittman agreed that she did not approve of pornography or masturbation.

[42] *Id.* at 86

[43] *Id.*

secretive with that. Right? When I do my own business in my own room. Right? Maybe it's the fact that there was like 20 damn fricking washcloths on the floor, you know."[44] He said he would masturbate 10-15 times after coming home from work within 20 minutes, sometimes so much that he would "lose count."[45] He then said, "I'm pretty . . . sure my kids did walk in on me. There's no . . . way they didn't walk in on me."[46] Before agents told Appellant Sarah knew about the white washcloths, he had not claimed that his children knew about his sexual habits. He later claimed Sarah had walked in on him having sex with Mrs. Pittman.

Appellant admitted that both Sarah and Amy would cuddle in bed alone with him after Mrs. Pittman had gotten up. He agreed that Amy sometimes slept in Sarah's bed.

Appellant described several things he claimed Sarah had done in an apparent effort to discredit her as a liar, damaged, confused, or a sexual deviant. He claimed she asked him, one week earlier, "what it means when someone says they want to eat my p[***]sy."[47] He claimed he was pretty sure that the boy who bullied Sarah "did some stuff to her," and as a result, he wanted Sarah physically examined because she was likely damaged by the boy.[48] He repeatedly urged investigators to "[g]et her checked" for DNA and to let him know if "she's had sex with somebody."[49] He said she "over exaggerates things" and needs "mental . . . help."[50] He alleged she "poked her brother in the butthole" while saying "Badoink," which was something Appellant had

---

[44] *Id.* at 101.

[45] *Id.*

[46] *Id.* at 107.

[47] *Id.* at 13.

[48] *Id.* Evidence at trial indicated a schoolmate expressed romantic interest in Sarah, but Sarah rejected him. Sarah alleged the boy and his friends bullied her at school, to the point that she became suicidal and eventually Mrs. Pittman withdrew Sarah from school to take undergraduate courses online. Sarah never alleged this schoolmate sexually assaulted her.

[49] *Id.* at 33.

[50] *Id.* at 16-17.

never see her do before.[51] And he claimed she then "grabbed her other brother's butt."[52]

Appellant admitted, "I pay a lot of attention to her. That I do."[53] He agreed he has told her she is "attractive"[54] and that she sometimes told him when she was starting her period. He admitted he was planning a daddy-daughter trip to Denver with Sarah and volunteered that he had to book a room with only one bed because there were no other suitable rooms available.

At a certain point in the interrogation, when the agents kept aggressively accusing him of raping Sarah and asking him about explicit sex acts with her, Appellant stopped responding. Then he said, "You're trying to attack the little boy that's inside of me."[55] Appellant then sat idle again as the agents asked him questions and he didn't respond. He later claimed he has multiple personalities, but he insisted that none of his personalities would sexually abuse Sarah. He maintained, "There's no f[***]ing way I did something to my daughter," but he said, "But somebody did something to my daughter."[56] He then urged that he needed the results of the DNA test to find out "what's going on with her."[57]

### 7. *The Defense theories*

The Defense argued that Sarah falsely accused her father of years of sexual abuse because she wanted to protect her relationship with her new boyfriend Brian (though she had only known him for a few days). The Pittman family was Mormon. Brian was not. According to the Defense theory, Sarah knew her parents would not approve of her relationship with Brian, and they would not approve of any pre-marital sexual contact of any kind. So that they would be able to date, Sarah and Brian concocted a scheme to falsely allege Appellant sexually abused Sarah. This would get Appellant out of the way, and Brian and Sarah would be free to date. On the day Brian called 911 to report the Appellant, Sarah and Brian took a "selfie" photo of themselves

---

[51] *Id.* at 97.

[52] *Id.*

[53] *Id.* at 55.

[54] *Id.* at 57.

[55] *Id.* at 80.

[56] *Id.* at 109.

[57] *Id.* at 110.

together in the manager's office at the commissary where they worked. They were smiling. According to the Defense, their scheme worked because they were still dating at the time of trial, and, according to one witness, Sarah had claimed they were engaged. At a minimum, Brian had given Sarah a "promise ring."

The Defense established during Sarah's cross-examination that Brian was the person who first called the police to report the abuse. Sarah agreed that she suffered from chronic constipation, needed assistance from her parents to administer enemas, and that Appellant sometimes administered enemas for her. Sometimes he applied prescription acne medicine to her back, which she could not do on her own, and she did not object to this assistance.

Sarah agreed that she had past mental problems—that she had contemplated suicide and that she had been admitted for inpatient mental health treatment in the 2013-2014 timeframe (this was about a year after the abuse started). She agreed she confided in her mother about problems in school when a boy at school bullied her after she refused to date him. She was so upset by the bullying that her mother withdrew her from school to instead attend an online school from home with only rare on-campus classes. Even though she confided in her mother then, Sarah confirmed she never told anyone—even her mother whom she had trusted before—about Appellant's abuse until she told Brian in April 2017. In fact, Mrs. Pittman learned of Sarah's sexual abuse allegation when a civilian police officer called her the day Brian called 911.

Sarah testified the entire household was volatile. Her parents argued "all the time" and yelled at one another.[58] The children would go hide in their rooms when this happened. By the time of trial, Mrs. Pittman was divorcing Appellant. The Defense argued Sarah had a motive to fabricate allegations against Appellant in order to live with her mother instead of Appellant.

The Defense presented several witnesses who opined that Sarah, Mrs. Pittman, and Brian were liars. And the Defense impeached Sarah by contradicting her testimony that she never had a Facebook account with a printout of what she agreed was her Facebook account. They also impeached Sarah on a potentially inconsistent statement about whether or how long her sister Amy bore red marks after Appellant hit her. The Government rehabilitated Sarah and Mrs. Pittman with the testimony of witnesses who believed they were truthful people.

---

[58] Record at 1012.

15

In an effort to impeach Brian, the Defense offered evidence that Brian denied at a previous motion session that he had been sexually active with Sarah around the time she made her allegations. He later admitted he digitally penetrated her shortly before she submitted to the exam but said he did not interpret the words "sexually active" to include such behavior.

*8. Conclusion*

Considering the evidence in the light most favorable to the prosecution, we find the convictions are legally sufficient. We are also independently convinced of Appellant's guilt beyond a reasonable doubt, and we find his convictions are also factually sufficient. Sarah's testimony was credible. It was corroborated by that of her siblings, her mother, and by Appellant's own admissions.

The physical evidence was inconclusive. Both medical experts agreed that a lack of physical findings does not disprove sexual abuse. Sarah never resisted, and Appellant used sexual lubricant. Both factors made it less likely that Sarah would become permanently scarred. Also, Appellant began his abuse shortly before Sarah started menstruating, the point when Sarah would be less likely to be injured by penile penetration.

Appellant's statements could reasonably be interpreted as evidence that Appellant was conscious of his own guilt and sought to provide innocent explanations why Sarah might be confused about what he did. His explanation of forcibly holding Sarah down, while she was naked, to administer a sexual lubricant-coated enema to her anus, is particularly disturbing. Sarah never alleged this happened. Further, the Appellant's insistence that the schoolmate raped Sarah—perhaps to provide an alternate reason for any physical findings in a SAFE exam—is contrary to the facts in the record. Sarah never made such an allegation. It is also reasonable to interpret Appellant's shifting statements, about where he touched Sarah while applying lotion to her back and about whether his sons knew he was masturbating, as evidence of his consciousness of guilt.

Appellant's statements about white washcloths could also be viewed as strong evidence of guilt—that he had to provide a strange and illogical explanation of leaving 20 ejaculate-stained washcloths lying on the floor in his room for all to see in order to find an innocent reason why Sarah would know he preferred to ejaculate into wet white washcloths. His claims that Sarah was a mentally damaged habitual liar run contrary to his actions. Just that weekend, Appellant was planning to take Sarah on a father-daughter trip to Denver. He had just bought her a diamond necklace for her birthday, and there was no evidence he ever sought assistance for her if she had, in fact, been physically injured by her schoolmate.

Finally, the Defense theory was not strong. First, Sarah had no reason to believe her mother—who was arguably a more devout Mormon than Appellant—would be any more likely to accept her relationship with Brian than Appellant would be. Lying about a serious allegation to get Appellant out of the house would not necessarily yield success under the Defense theory because Mrs. Pittman could still try to prevent Sarah from dating Brian. Second, Sarah had no reason to fabricate an allegation in order to cover up any sexual contact she may have had with Brian. No one knew about any sexual contact until DNA evidence revealed Brian's DNA was on her underwear. That analysis was conducted *because of* Sarah's report of sexual abuse. Simply put, there was no reason to lie to cover up a perceived offense that had not been discovered. Finally, we note that Appellant was a Senior Chief Petty Officer with over 20 years of service who, until just months before Sarah's report, was the sole family breadwinner. As a 16 year-old-teenager, Sarah was likely smart enough to know that her allegation might reasonably result in financial disaster for her, her younger siblings, and Mrs. Pittman.

We find the evidence is legally sufficient to prove Appellant's guilt of the specifications alleged in Charges I and II. In addition, we find the evidence proved the elements of the offenses beyond a reasonable doubt. In contrast, we believe the Defense theory is fanciful and speculative at best, and we reject it. The convictions are also factually sufficient. This AOE lacks merit.

## B. Sarah's Mental Health Records

Appellant argues the military judge committing prejudicial error by denying the Defense motion to produce Sarah's mental health records from between 2013 and 2017 and failing to provide an alternate remedy. We review the military judge's denial of the Defense motion for an abuse of discretion, and Appellant is only entitled to relief if such "abuse of discretion materially prejudiced his substantial rights."[59]

Under MILITARY RULE OF EVIDENCE 513:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist . . . , in a case arising under the [UCMJ], if such communication was made for

---

[59] *United States v. Chisum*, 77 M.J. 176, 179 (C.A.A.F. 2018) (citing Art. 59(a), UCMJ).

the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.[60]

Sarah's mental health records are covered by this rule. One exception to the rule under MIL. R. EVID. 513(d)(2) holds that there is no privilege "when the communication is evidence of child abuse or of neglect, or in a proceeding in which one spouse is charged with a crime against a child of either spouse."[61]

When the parties dispute whether privileged communications should be produced—even for in camera review—the moving party must show, by a preponderance of the evidence:

> (A) a specific factual basis demonstrating a reasonable likelihood that the records or communications would yield evidence admissible under an exception to the privilege;

> (B) that the requested information meets one of the enumerated exceptions under subsection (d) of [MIL. R. EVID. 513];

> (C) that the information sought is not merely cumulative of other information available; and

> (D) that the party made reasonable efforts to obtain the same or substantially similar information through non-privileged sources.[62]

"If the moving party satisfies all the prongs, but meets no enumerated exception under MIL. R. EVID. 513(d), then the military judge determines whether the accused's constitutional rights still demand production or disclosure of the privileged materials."[63] If so, the military judge may fashion an appropriate remedy.

In this case, the military judge received written filings from the parties and the victim's legal counsel, conducted a closed session to allow the parties to present evidence and argument, and issued a written ruling denying the

---

[60] MILITARY RULE OF EVIDENCE 513(a), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.).

[61] MIL. R. EVID. 513(d)(2).

[62] MIL. R. EVID. 513(e)(3).

[63] *J.M. v. Payton-O'Brien*, 76 M.J. 782, 789-90 (N-M. Ct. Crim. App. 2017).

Defense motion.[64] Then, for reasons further described below, he denied production of the records, even for an in camera review.

On appeal, Appellant asserts two bases existed to justify production: (1) that the records *could* contain any statements Sarah "may have made about the offenses"; and (2) that the records would show that Sarah had the opportunity to disclose the sexual abuse "over the same time period that encompassed her allegations of sexual" abuse, but that she failed to do so.[65] Therefore, the Defense was entitled to the records both for what they *might* show—statements by Sarah, if any—but also for what they *would likely not* show—any statements by Sarah because she never disclosed the abuse until she told Brian. We review the military judge's ruling based on the arguments made at trial, not those made on appeal.

In its motion at trial, the Defense requested in camera review of all of Sarah's mental health treatment records to any counselor from 2014-2017 because "[Sarah's] communications are evidence of child abuse in a proceeding in which one spouse is charged with a crime against a child of either spouse."[66] The Defense argued the MIL. R. EVID. 513(d)(2) exception applied. Relying on *United States v. Klemick,*[67] the Defense reasoned that any communications Sarah made "to . . . counselors [were] evidence of alleged child abuse" which "would tend to prove, or disprove the charges at hand."[68]

During oral argument to the military judge, the Defense expanded their motion to include the "constitutional argument that the Defense has a right to prepare an adequate defense," citing *J.M. v. Payton-O'Brien.* The Defense argued that Sarah had "some substantial mental health history."[69] They argued an in camera review was required to support Appellant's constitutional right to prepare a defense because the records "could provide another reasonable explanation of why these allegations were made, why a very trou-

---

[64] Appellate Exhibits XXX (Defense Motion), XXXIV (Government Response), XXXIX (Victim's Legal Counsel's Response), and XLIX (Military Judge's Ruling) pertain.

[65] Appellant's Brief of 5 Apr 2019 at 17-18.

[66] AE XXX at 4.

[67] 65 M.J. 576 (N-M. Ct. Crim. App. 2006).

[68] AE XXX at 5.

[69] Record at 419.

bled young woman would feel abandoned and make accusations against her father."[70]

In support of their motion, the Defense presented witness testimony and documents that showed: (1) that Sarah had suffered from depression; (2) that Brian observed Sarah having apparent panic attacks, which Sarah said were Post Traumatic Stress Disorder attacks brought on by thoughts of Appellant; (3) that Sarah had been hospitalized in February 2015 when she had suicidal thoughts because she had been bullied in school after she rebuffed a peer's romantic advances; and (4) that Sarah had been treated by a psychologist weekly from the time she was hospitalized until the time of pre-trial motions in this case. Appellant was at sea when Sarah was first hospitalized in February 2015; he returned to be with her. During the motion hearing, the Defense had an expert psychologist available to testify but elected not to present her testimony.

The military judge ruled that the Defense failed to satisfy the MIL. R. EVID. 513(e)(3) test. He further held that the "Defense has not shown, by a preponderance of the evidence, that the accused's constitutional rights demand production or disclosure of the privileged material."[71] His ruling did not constitute an abuse of discretion.

### 1. Military judge's ruling on MIL. R. EVID. 513(e)(3)

The military judge ruled that the Defense failed to meet its burden on all four prongs of the Mil. R. Evid. 513(e)(3) test. In order to justify in camera review, the Defense must show all four prongs are met. Therefore, we need not assess the military judge's treatment of each individual prong if we agree that the Defense failed to meet any one of them. At a minimum, we find the military judge did not abuse his discretion by holding that the Defense failed to meet its burden under Prongs C and D.

The evidence before the military judge showed that Sarah never disclosed the abuse to anyone before she told Brian in April 2017. Therefore, her treatment records did not likely contain any statements about the abuse. Assuming that Sarah's treatment providers were mandated to report child abuse, only two scenarios are possible. Either Sarah never disclosed the abuse, as she later testified at trial, and no such statements existed; or, she disclosed the abuse but her licensed mental health provider failed to make

---

[70] *Id.* at 422.

[71] AE XLIX at 7.

what would almost certainly be a mandatory disclosure to state authorities. This second possibility is unlikely, but if such statements existed they would likely constitute *prior consistent statements.* These statements would bolster Sarah's credibility and undermine the Defense line of cross-examination that Sarah did not report the abuse because it never happened.

Proof that Sarah never told her counselor about the abuse would be merely cumulative of the other information already available to the Defense. The Defense already knew that Sarah had confided in Mrs. Pittman when she had problems with the boy at school but that she never told Mrs. Pittman about the abuse. Sarah also regularly attended church, and she was part of church-organized groups, meaning she had peers and church leaders in whom she could confide. Even if Sarah had told her counselor about the sexual abuse, her statements would be merely cumulative of the investigative and forensic interview statements that were already available to the Defense.

Additionally, the Defense failed to show that it made reasonable efforts to pursue the information through non-privileged sources. The Defense presented no evidence that they interviewed Sarah's friends, church leaders, school teachers, work colleagues, or neighbors.

The military judge's ruling that Defense failed to meet all four prongs of the Mil. R. Evid. 513(e)(3) test did not constitute an abuse of discretion.

*2. Military Judge's finding that in camera review was not constitutionally required*

In *J.M. v. Payton-O'Brien,* we held that the psychotherapist-patient privilege "must not infringe upon the basic constitutional requirements of due process and confrontation."[72] Although Congress modified MIL. R. EVID. 513 to remove the exception to the privilege when evidence is constitutionally required, we held that this "removal . . . is inconsequential insofar as [it] . . . purports to extinguish due process and confrontation rights."[73] We held that "[i]f the moving party satisfies all the prongs [of the MIL. R. EVID. 513(e)(3) test], but meets no enumerated exception under MIL. R. EVID 513(d), [Prong B of the MIL. R. EVID. 513(e)(3) test], then the military judge determines whether the accused's constitutional rights still demand production or disclosure of the privileged materials."[74] If so, it is appropriate for the military

---

[72] 76 M.J. at 788.

[73] *Id.*

[74] *Id.* at 789-90.

21

judge to "give[ ] the victim an opportunity to waive the privilege for in camera review."[75]

As discussed above, the military judge did not abuse his discretion in ruling that the Defense failed to meet all four prongs of the MIL. R. EVID. 513(e)(3) test. Additionally, the military judge ruled that "the Defense failed to present a specific factual basis demonstrating a reasonable likelihood that the records would yield information constitutionally required to be admitted or disclosed."[76] We agree.

The evidence showed that Sarah was admitted for inpatient mental health treatment, while Appellant was out to sea, because her schoolmate bullied her—not because she made an allegation that Appellant abused her.

The Defense argued that an in camera review was constitutionally required because of Sarah's "substantial mental health history"[77] and the possibility that her records would reveal that Sarah deliberately fabricated her allegations because she was "troubled" and felt "abandoned."[78] The Defense then invited the military judge to search all of Sarah's records for the three types of evidence this Court listed in *J.M. v. Payton-O'Brien* as a "non-exhaustive list illustrat[ing] situations in which the privacy rights of the victim may yield to the constitutional rights of the accused."[79] These areas included: (1) "recantation or other contradictory conduct by the alleged victim"; (2) "evidence of behavioral, mental, or emotional difficulties of the alleged victim"; and (3) "the alleged victim's inability to accurately perceive, remember, and relate events."[80]

Although the Defense cited these possible classes of statements they sought, they did not meet their burden to articulate why there was a reasonable likelihood that Sarah's treatment records would contain such statements or evidence. The Defense presented no evidence to suggest that Sarah's counselor ever asked her any questions that would result in exculpatory or inconsistent statements about the abuse, such as whether she felt safe in her

---

[75] *Id.* at 790.

[76] AE XLIV at 7.

[77] Record at 419.

[78] *Id.* at 422.

[79] 76 M.J. at 789.

[80] *Id.*

home, whether she was sexually active, or whether she was being abused. Nor did the Defense make a cogent argument why Sarah's mental condition would likely result in a false allegation. They never presented any evidence to suggest Sarah could not "accurately perceive, remember, and relate events" or to suggest any other information in her records would have to be disclosed to preserve Appellant's constitutional rights.[81]

We note that a "reasonable likelihood" is a low evidentiary bar and that in camera reviews can be important tools to preserve an accused's constitutional right to present a defense. There may be cases in which an in camera review may be constitutionally required when a victim has undergone years of psychotherapy during the same time period of her alleged abuse. However, in the circumstances of this case and based on the arguments and evidence the Defense presented in support of their motion, the military judge did not abuse his discretion in denying the Defense request. The mere fact that the victim had a mental health condition and received psychological treatment during and after her abuse does not—in and of itself—give rise to a reasonable likelihood that her treatment records will contain evidence that is constitutionally required for a defense. None of the arguments the Defense advanced justified an in camera review. This AOE is without merit.

### 3. No material prejudice

Even if the military judge had abused his discretion, Appellant was not materially prejudiced and would not be entitled to relief. Sarah confirmed at trial, multiple times during questioning, that she never disclosed the abuse to anyone before she told Brian. When asked, "[W]ho's the first person you told about what . . . was going on?," referring to sexual abuse, Sarah replied that it was Brian who she had only met in April 2017.[82] Defense reconfirmed this fact on cross-examination, and Sarah agreed that she "didn't tell anybody for five years until [she] told [Brian] the day before 911 was called."[83] She also confirmed she never reported any physical abuse against her or her siblings until April 2017.

In addition, the Defense was permitted to elicit testimony that Sarah was admitted to the hospital for suicidal ideations sometime around 2013 or

---

[81] *Id.*

[82] Record at 983.

[83] *See id.* at 1040.

2014.[84] Mrs. Pittman confirmed this. Mrs. Pittman also testified that Sarah confided in her about school and "boy" problems but that Sarah never told her about the sexual abuse. In fact, Mrs. Pittman learned of Sarah's allegation when the local police called her.[85] Therefore, it was shown that Sarah elected to forego potential avenues of reporting the abuse and never did so until April 2017.

As for the Defense's second purpose, seeking any statements Sarah may have made about the abuse, Appellant suffered no prejudice even if the military judge had erred. If Sarah's records revealed that Sarah told her counselor that Appellant was sexually abusing her, the Defense would have uncovered prior consistent statements that would undercut their theory that Sarah lied in order to protect her relationship with Brian.

Furthermore, the Government case against Appellant was strong, as discussed above. Even if the military judge had erred, Appellant was not prejudiced and is not entitled to relief.

## C. Legal and Factual Sufficiency of Child Abuse Convictions

Pursuant to *United States v. Grostefon,* Appellant contests the factual sufficiency of his convictions under Charge III, Specifications 1-3.[86] In these specifications, Appellant was convicted of physically assaulting all of his children other than Sarah. Appellant raises two lines of argument. First, he alleges that the three child victims were biased witnesses whose testimony was incredible. Second, Appellant argues that even if his children's testimony is to be believed, his actions constituted proper parental discipline. We note that, although Appellant's children testified about spanking, Appellant was not charged with, nor was he convicted of, spanking his children. He was

---

[84] During the pre-trial motion hearing, Mrs. Pittman testified Sarah was hospitalized in 2015. Neither the military judge's analysis nor our analysis turns on the exact date of Sarah's hospitalization.

[85] *Id.* at 1543.

[86] Although the appellant does not challenge the legal sufficiency of these charges, we are mindful that Article 66(c), UCMJ, requires this court "to conduct a *de novo* review of [both the] legal and factual sufficiency of the case." *Washington*, 57 M.J. at 399. "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297-98, (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). We find the evidence legally sufficient.

charged and convicted of striking Mike and Oliver on the face, torso, and body with his hands and a belt and grabbing each boy by the neck with his hand. He was charged and convicted of striking Amy on the face with his hand. We reject both of Appellant's arguments.

As for Appellant's argument that his children were biased, he alleges three sources of bias. He theorizes that Mrs. Pittman tainted the children's testimony. Because Mrs. Pittman was divorcing Appellant, she was likely having conversations with the children which "likely influenced" their testimony, leading them to "exaggerate the punishments" Appellant inflicted.[87] Next, he argues the children were biased because they wanted to live with their mother after the divorce. Finally, he argues they sought to bolster Sarah's sexual abuse allegations by "painting Appellant as a bad actor."[88]

These arguments are without merit. No evidence in the record supports these assertions. The three child witnesses provided emotional testimony that demonstrated that they were conflicted about testifying against their father. Both of Appellant's sons testified they still loved their father in spite of his abuse. Additionally, the children's testimony was bolstered by Appellant's own statements indicating that he used what described as tough love on his children, especially on his sons who bore the brunt of the abuse.

Appellant admitted that after his Individual Augmentation tour, he was traumatized but did not seek treatment and instead yelled at his family and "treat[ed] them like shit," especially his sons.[89] He admitted he was "rough" with them.[90] We find the three child witnesses provided credible testimony.

Likewise, we reject Appellant's argument that his actions were proper parental discipline. Appellant told NCIS agents, "I'm Polynesian, I was raised you spank children."[91] Spanking is not per se criminal; abuse is.

Considering the "amount of force used, the instrument used, whereupon the body the force or instrument was applied, the number of times . . . used,

---

[87] Supplemental Brief of Appellant of 22 Apr 19 at 5.

[88] *Id.*

[89] PE 1 at 40-41.

[90] *Id.* at 43.

[91] *Id.* at 30.

the age and size of the child, and the size of the accused," we are convinced of Appellant's guilt.[92]

Mike, Appellant's oldest son, testified that Appellant spanked him, but if he had committed a more serious perceived infraction, "he'd kind of just throw us around and, like, punch us and stuff like that."[93] He also whipped his sons with a belt, sometimes as many as 20 times, on the upper thighs and buttocks. This punishment was meted out when the boys ate his food or used his things without permission, disrespected Mrs. Pittman, or failed to clean the house to Appellant's satisfaction. Once, Appellant whipped his sons so violently that he damaged the wall. Another time, he threw a chair and damaged another wall. Photos of the damage were admitted at trial. One time, he threw a vacuum cleaner. It missed his sons but damaged the wall. Both sons testified that Appellant sometimes held a machete while yelling at his children or while threatening that they needed to get their grades up or else.

At times, Appellant would force his sons into a corner where they couldn't escape. Then he would repeatedly punch them in the chest and stomach with a closed fist to the point that they had trouble breathing. While beating his sons, he would call them "bitch," "cocksucker," and "worthless."[94] Mike testified Appellant punched him in the face. He testified this abuse began in 2011 or 2012. Mike admitted his father became angry with him once when he learned that Mike had used marijuana. Mike testified that he and Oliver fantasized about running away.

Oliver was 15 at time of trial. He suffered the same physical abuse as Mike described. He testified that Appellant used the metal belt buckle end of the belt to beat him and his brother. He added, "And he would just continuously hit us until we would start to cry until he would see marks or so on."[95] He recounted being pushed into a corner so Appellant could repeatedly punch him in the torso. He recalled the abuse dating back to 2011. He was scared of Appellant because Appellant would threaten to hurt him even more. He saw Appellant slap his sisters on the face.

---

[92] *See* Record at 2126 (the military judge's instruction on the defense of parental discipline).

[93] *Id.* at 1071.

[94] *Id.* at 1075.

[95] *Id.* at 1149.

Amy and Sarah both witnessed Appellant abuse his sons. Amy added that Appellant sometimes beat her brothers when they attempted to "protect my mother from my dad yelling at her."[96] The abuse occurred for as long as she could remember.

As for the abuse conviction against Amy on a single occasion in April 2017, Amy testified that Appellant smacked her in the face hard and called her a "fat bitch."[97] He did this because she wore his sweatshirt and stretched out the cuffs. Mrs. Pittman and Sarah witnessed this incident and testified about it at trial.

For her part, Mrs. Pittman witnessed some of the physical abuse but was mostly powerless to stop it. Mrs. Pittman testified she had witnessed Appellant slapping and "[c]ornering" the children.[98] She nearly divorced Appellant in 2011 because of an incident when he severely beat Oliver. She described "hearing a shriek from my son. A scream that I'd never heard from him before."[99] She ran to the room to find Appellant holding Oliver up by his neck, pinning him against a door. However, after filing for a restraining order, she elected to remain married to Appellant when he professed that he had changed. But he apparently resumed the abuse.

Based on the witnesses' testimony, we easily find that the defense of parental discipline did not apply. Appellant's actions demonstrated that he acted out of anger, using force that was excessive. He demeaned, bullied, and terrorized his children to relieve his own stress. The degree of force used and the manner in which it was inflicted was wholly inconsistent with proper parental discipline. We are convinced the Government proved Appellant's guilt beyond a reasonable doubt for these offenses.

## D. Ineffective Assistance of Counsel

We review claims of ineffective assistance of counsel de novo.[100] Appellant bears the burden and must clear "a high bar" to prevail on such a claim.[101] He must show: (1) that his counsel's performance was deficient and (2) that, but

---

[96] *Id.* at 1192.

[97] *Id.* at 1154.

[98] *Id.* at 1431.

[99] *Id.* at 1434.

[100] *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015).

[101] *Id.* at 371.

for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different.[102]

Specifically, in this assignment of error, raised pursuant to *United States v. Grostefon*, Appellant asserts that his trial defense counsel should have presented the testimony of three witnesses who would testify that Brian was a liar who was "capable of convincing [Sarah] that she could get Appellant out of her home by claiming that Appellant assaulted her."[103] Appellant argues the Defense should have presented these witnesses' testimony to relay specific out-of-court conversations they had with Brian and their opinion that Brian "was capable of manipulating [Sarah] into making a false claim against her father."[104]

The trial defense counsel called one of these witnesses to testify that Brian had a poor character for truthfulness. The rules of evidence would not permit presentation of the opinions Appellant claims his counsel should have offered. Although the trial team did not offer these specific witnesses' testimony, they presented this defense at trial. It was the Defense's "entire theory of the case" that Sarah and Brian concocted a scheme to falsely accuse Appellant of sexually abusing Sarah so that the young couple could be together.[105] The trial defense team developed this theme during cross-examination of the Government's witnesses and in the Defense case in chief. Ultimately, the members rejected that theory, and we do likewise. This AOE lacks merit.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. Arts. 59 and 66, UCMJ. The findings and sentence as approved by the convening authority are **AFFIRMED**.

Senior Judge HITESMAN and Judge STEPHENS concur.

---

[102] *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

[103] Appellant's Supplemental Brief of 22 Apr 2019 at 9.

[104] *Id.* at 10.

[105] Record at 1716.



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court